# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| JAY SUNNY BAJAJ, as Unit Holder of RAZOR MANAGEMENT AGGREGATOR LLC, and as Management Holder Representative of OSP RAZOR HOLDINGS LLC and OSP RAZOR MANAGEMENT AGGREGATOR LLC,<br><br>     Plaintiff,<br><br>   v.<br><br>OSP RAZOR HOLDINGS LLC,<br><br>     Defendant. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | C.A. No. 2025-0976-BWD |

## POST-TRIAL MEMORANDUM OPINION

Date Submitted: June 30, 2026
Date Decided: July 17, 2026

Brian E. Farnan and Michael J. Farnan, FARNAN LLP, Wilmington, DE; OF COUNSEL: Travis Robert-Ritter and Michael Showalter, ALBRECHT RITTER, PLLC, Coral Gables, FL; *Attorneys for Plaintiff Jay Sunny Bajaj.*

Raymond J. DiCamillo, Matthew W. Murphy, Andrew L. Milam, Zachary R. Greer, Daniel Boucot, Madison T. Devlin, RICHARDS, LAYTON & FINGER, P.A., Wilmington, DE; *Attorneys for Defendant OSP Razor Holdings LLC.*

**DAVID, V.C.**

The defendant in this action, OSP Razor Holdings LLC ("Defendant" or the "Company"), was formed in 2021 to acquire Digital Management Holdings, LLC ("DMI"), an information technology services company founded by the plaintiff, Jay Sunny Bajaj ("Plaintiff"), who rolled over equity in the acquisition.

The Company is taxed as a pass-through entity. Under its operating agreement, the Company must make quarterly advance tax distributions to its members, "subject to having cash available after taking into account reasonable reserves as determined in the good faith discretion of the Board." The operating agreement includes a highly deferential definition of "good faith" under which "the Board, acting on behalf of the Company or in connection with the Company's business and affairs, shall be conclusively presumed to be acting in good faith" if a majority of the directors participating in the decision "subjectively believe" that the decision "is in or is not opposed to the best interests of the Company."

In 2022, the Company incurred a loss of $10 million, but its rollover members, including Plaintiff, incurred "phantom" tax liability on taxable income. In August 2023, the Company's board of directors met, considered the Company's cash position, and determined that the Company lacked "cash available after taking into account reasonable reserves" to pay tax distributions. By August 2025, when Plaintiff filed this action, the Company still had not paid tax distributions.

1

This memorandum opinion follows an expedited three-day trial in which Plaintiff sought to prove that the Company has breached its obligation under the operating agreement to pay tax distributions to the rollover members. Plaintiff seeks to remedy that breach with an order of specific performance compelling the Company to pay tax distributions, as well as damages.

At trial, Plaintiff failed to prove that the board acted in bad faith. His primary theory of bad faith—that the Company's majority owner caused the board to withhold tax distributions as a pretext to force a buyout of the rollover members— did not bear out at trial. Plaintiff did not prove that the board failed to make "predicate" determinations of "cash available after taking into account reasonable reserves," or that the board made determinations in bad faith. Instead, the record of the Company's cash position supports a finding that the board reached a rational decision for comprehensible reasons. Each of Plaintiff's additional arguments—that the Company should have incurred additional debt to pay tax distributions, that the board applied the wrong standard and treated distributions as "optional," and that the directors "rewrote" minutes to conceal their misconduct—fail to show that the board acted in bad faith when deciding that the Company lacked available cash to pay tax distributions.

Because Plaintiff failed to prove a breach of the operating agreement, judgment is entered for Defendant.

## I. BACKGROUND

The following facts are as the Court finds them following a three-day trial held April 13 through April 15, 2026.[1]

### A. OceanSound Acquires DMI.

Plaintiff founded DMI, a Delaware limited liability company that provides information technology services, in 2002.[2] Plaintiff served as DMI's Chief Executive Officer ("CEO") from its founding until May 2023.[3] Plaintiff's father, Ken Bajaj, served as DMI's Chief Operating Officer ("COO") until 2021, and Michael Altshuler served as DMI's Chief Financial Officer ("CFO") from 2020 until 2024.[4]

OceanSound Partners, LP ("OceanSound") is a private equity firm that focuses on middle-market technology businesses.[5] On September 17, 2021, OceanSound acquired an indirect majority interest in DMI through the Company for

---

[1] The Stipulation and Pre-Trial Order is cited as "PTO ¶ __". Dkt. 98. Trial testimony is cited as "Tr. (Witness) at __". *See* Dkts. 106–10. Joint exhibits are cited as "JX __" unless otherwise defined.

[2] PTO ¶¶ 2, 7; Tr. (Bajaj) at 709:4–15.

[3] PTO ¶ 7.

[4] *Id.* ¶¶ 12, 14.

[5] *Id.* ¶¶ 2, 9; Tr. (Benavides) at 60:1–12.

$543.1 million, plus potential earnout payments, pursuant to an equity purchase agreement (the "Acquisition").[6]

The post-Acquisition Company was governed by the Amended and Restated Limited Liability Company Agreement of OSP Razor Holdings LLC (the "Operating Agreement").[7] The Company emerged with two members. OSP Razor Equity Aggregator, LP, an entity indirectly owned by OceanSound, held 82% of the membership interests in the Company.[8] OSP Razor Management Aggregator LLC, an entity through which Plaintiff and other former DMI equity holders (collectively, the "Rollover Members") rolled over $58.9 million of equity into the Company, owned the remaining 18%.[9]

After the Acquisition, Plaintiff continued to serve as DMI's CEO while nonparty Rocky Thurston replaced Ken Bajaj as COO.[10] The Operating Agreement contemplated a seven-member board of directors (the "Board") comprising four classes of directors: one "CEO Director," one "Rollover Director" appointed by

---

[6] PTO ¶ 17; JX 6; *id.* § 1.7(a); JX 56 at 18. Plaintiff was entitled to 51% of the earnout payments from the Acquisition. Tr. (Bajaj) at 719:7–9.

[7] JX 9 [hereinafter OA]. The Operating Agreement has since been amended, but the parties have not identified any material changes to the provisions relevant to this dispute. *See* JX 1001.

[8] PTO ¶¶ 9, 19.

[9] *Id.*

[10] *Id.* ¶¶ 7, 13.

4

Plaintiff in his capacity as the "Principal Rollover Seller," one "Independent Director," and four "OSP Directors" appointed by OceanSound.[11] At closing, Plaintiff served as the CEO Director; Ken Bajaj served as the Rollover Director; Joe Benavides, Addison Nordin, Jeff Kelly, and Theodore Coons served as the OSP Directors; and the Independent Director seat was vacant. Benavides served as Chairman of the Board, and the Operating Agreement vested him with "the majority voting power of the Board."[12]

### B. The Operating Agreement Contemplates Pass-Through Tax Liability And Tax Distributions.

Section 7.3(d) of the Operating Agreement explains that "[t]he Members intend that the Company shall be treated as a partnership for federal, state and local income and franchise tax purposes" and provides that "[e]ach Member and the Company shall file all tax returns consistent with such treatment."[13]

Under federal tax law, a member of a limited liability company that elects pass-through tax treatment may owe taxes on "phantom income," taxable income that is allocated to the member even if the company has operated at a loss and the member has not received cash distributions from the investment.[14] Although the

---

[11] OA § 4.1(b)(i).

[12] *Id.* § 4.1(b)(i)(D).

[13] *Id.* § 7.3(d).

[14] *See* JX 107 at 4. Because OSP Razor Management Aggregator LLC has a lower historical tax basis in the Company and did not receive the purchaser-specific

5

possibility of owing taxes on phantom income may seem onerous, Section 6.2(c) of the Operating Agreement confirms that "[t]he Members are aware of the tax consequences of the allocations made" under the Operating Agreement "and agree to be bound by the provisions of this Section 6.2 in reporting their shares of items of Company income, gain, loss and deduction."[15]

Section 6.3 of the Operating Agreement provides that "[n]o Member shall have the right to demand or receive Distributions of any amount, except as expressly provided in this Article VI."[16]  Section 6.6 governs tax distributions to Members ("Tax Distributions").  That section states in its entirety:

> Notwithstanding any other provision herein to the contrary, so long as [the Company] is treated as a partnership for federal income tax purposes, **[the Company] shall, subject to having cash available after taking into account reasonable reserves as determined in the good faith discretion of the Board, make quarterly advance cash distributions to each Member** in an amount equal to the Member's Quarterly Estimated Tax Amount for such quarter ("Tax Distributions"), and the Board shall use commercially reasonable efforts to cause such Tax Distributions to be made at least five days before estimated U.S. federal income tax payments for individuals are due.  If, on the date of a quarterly estimated distribution, the cash available to [the Company] (as determined in the good faith discretion of the Board) is not sufficient to distribute to each Member the full amount of such Member's Tax Distribution that would otherwise be

---

Section 743(b) adjustment allocated to acquisition goodwill, it does not receive corresponding amortization deductions.  *See* I.R.C. § 743.  The resulting taxable income is then passed through to the Rollover Members with no corresponding deductions passed through to offset it.

[15] OA § 6.2(c).

[16] PTO ¶ 30; OA § 6.3.

required under this Section 6.6, then (A) distributions shall be made by [the Company] to the Members pursuant to this Section 6.6 to the extent of the cash so available in proportion to the amounts that would have been distributed to each Member pursuant to this Section 6.6 if there had been a sufficient amount of cash available to [the Company] to make such Tax Distribution in full, (B) [the Company] shall make future distributions as soon as reasonably practicable following the date on which there exists an amount of cash available to [the Company] after taking into account reasonable reserves as determined in the good faith discretion of the Board sufficient to pay the remaining portion of such Member's required Tax Distribution and (C) [the Company] shall not, until the remaining portion of each such Member's required Tax Distribution is so distributed, make a Distribution other than pursuant to this sentence. **[The Company] shall make commercially reasonable efforts to ensure that any financing documents allow for full Tax Distributions**. Notwithstanding anything to the contrary in this Agreement, all distributions made to a Member pursuant to this Section 6.6 shall be treated as an advance against, and thus reduce, the amount of the next succeeding Distribution or Distributions which would otherwise have been paid to such Member pursuant to Section 6.4 or Section 11.1, if applicable.[17]

Under Section 4.7(c), the Board is "conclusively presumed" to have acted in good faith if a majority of the Board participating in a decision subjectively believes that the decision "is in or not opposed to the best interests of the Company":

> For all purposes of this Agreement, each Covered Person (acting in its capacity as such) and **the Board, acting on behalf of the Company or in connection with the Company's business and affairs, shall be conclusively presumed to be acting in good faith if** such Person (or, in the case of the Board, **a majority of the Directors participating in the decision**) **subjectively believe(s) that** the action taken (or omitted to be taken), the consent or approval given or withheld, or **the decision**

---

[17] OA § 6.6 (emphasis added).

**or determination made or not made, is in or is not opposed to the best interests of the Company**.[18]

## C.    The Company Finances The Acquisition With Debt.

To finance the Acquisition, Plaintiff executed a credit agreement on behalf of the Company and its affiliates (the "Credit Agreement") that provided for a $265 million term loan (the "Term Loan") and a $40 million revolving credit facility (the "Revolver").[19]  By 2025, the variable interest rate on the Term Loan had risen to approximately 11.25%.[20]

The Credit Agreement includes covenants restricting the Company's ability to incur additional debt, sell assets, engage in transactions with affiliates, make additional investments, or issue dividends.[21]  Among other restrictions, under Section 2.8(c) of the Credit Agreement, if the Company disposes of an asset, it must use the proceeds to pay down its debt to stay within a specified leverage ratio (the "Consolidated Total Net Leverage Ratio"):

---

[18] *Id.* § 4.7(c) (emphasis added).  Section 4.7(c) also provides that when the Board or a director takes action on behalf of the Company, it "shall be entitled to consider only such interests and factors as it desires, including its own interests, and shall have no duty or obligation (fiduciary or otherwise) to give any consideration to any interest of or factors affecting the Company [or] any of the Members." *Id.* § 4.7(c).

[19] PTO ¶ 22; JX 15 at 10.

[20] JX 15 § 1.1 (defining "LIBOR Rate," "Base Rate," and "Applicable Margin"); *id.* § 2.3; Tr. (Carlson) at 658:14–23.  The interest rate on the Revolver is 225 basis points lower than the interest rate on the Term Loan.  PTO ¶ 22; JX 15 § 1.1 (defining "Applicable Margin").

[21] PTO ¶ 23.

8

[P]romptly upon receipt by a Credit Party and/or such Restricted Subsidiary of the Net Cash Proceeds of such Disposition or Event of Loss, the Borrower shall deliver, or cause to be delivered, an amount equal to either (i) solely in the case of a Disposition or Event of Loss pursuant to clause (c)(i), 100% of such excess Net Cash Proceeds or (ii) solely in the case of a Disposition of Identified Assets, the amount of Net Cash Proceeds to the extent required to cause the Consolidated Total Net Leverage Ratio not to exceed 3.50 to 1.00 on a pro forma basis (with no netting of the Net Cash Proceeds of such Disposition in such calculation), in each case, to the Administrative Agent for distribution to the Lenders as a prepayment of the Loans, which prepayment shall be applied in accordance with Section 2.8(f) hereof.[22]

To obtain additional financing, OSP Razor Intermediate Holdings LLC, a Company subsidiary,[23] also issued a $40 million senior payment-in-kind note bearing 11.25% interest (the "PIK Note").[24] The PIK Note comes due on October 25, 2028, but requires a payment of approximately $30 million by October 25, 2026.[25] Interest on the PIK Note accrues as additional principal.[26]

### D. The Company And OceanSound Execute A Management Consulting Agreement.

In connection with the Acquisition, the Company and OceanSound entered into a management consulting agreement (the "Management Consulting

---

[22] JX 15 § 2.8(c).

[23] Verified Compl. for Equitable Relief [hereinafter Compl.], Ex. A, Dkt. 1.

[24] PTO ¶ 26.

[25] JX 14 at 6, 8, § 1.4(b); JX 455 at 28; Tr. (Benavides) at 269:1–5.

[26] PTO ¶ 26.

Agreement")[27] under which the Company must pay OceanSound an annual "Advisory Fee" representing "the greater of (i) $1,500,000 (the 'Base Amount') and (ii) three percent (3%) of annual Consolidated EBITDA."[28]  The Management Consulting Agreement also requires the Company to pay OceanSound "Transaction Fees" for transactions in which OceanSound is involved in "an aggregate amount . . . equal to the greater of (i) $250,000; and (ii) an amount equal to three percent (3%) of the Transaction Value."[29]

Section 4(c) of the Management Consulting Agreement states:

> All Advisory Fees or Transaction Fees shall be paid to the extent permitted under any credit agreement or other definitive documentation concerning the financing of the Company Group (the "Financing Documents"), and if not permitted to be paid, shall be deferred and shall be payable as soon as permitted under the Financing Documents or upon the payment in full of all obligations under the Financing Documents.  If any Advisory Fee or Transaction Fee is not timely paid, such Advisory Fee or Transaction Fee, as applicable, shall accrue interest at a rate of five percent (5%) per annum, compounded quarterly, from the date due until the date of payment (the "Interest Payment").[30]

### E.    DMI Makes Acquisitions.

Between March 2022 and early 2023, DMI acquired three additional businesses.  In March 2022, DMI acquired Aurotech, LLC using $14.3 million in

---

[27] PTO ¶ 21; JX 11.

[28] PTO ¶ 21; JX 11 § 4(a)(1).

[29] PTO ¶ 21; JX 11 § 4(b)(1).

[30] JX 11 § 4(c).

cash.[31]  In October 2022, DMI acquired Ambit Group for $37 million, using cash and OceanSound equity.[32]  In early 2023, DMI acquired Simplex Mobility Inc. by drawing down $16 million on the Revolver.[33]  The Board, including Plaintiff, unanimously approved each of those transactions.[34]

### F.    The Rollover Members, Including Plaintiff, Incur Tax Liability.

Although the Company incurred a loss of $10 million in 2022, the Rollover Members were allocated approximately $6.628 million in taxable income for that year.[35]  OceanSound did not incur a similar tax burden.[36]

Plaintiff's tax advisor informed him of his 2022 tax liability in early 2023.[37] Thereafter, Plaintiff began to engage with individuals at the Company about Tax Distributions to the Rollover Members under Section 6.6 of the Operating Agreement.

At one point in April 2023, Plaintiff and Benavides spoke on the phone about distributions.  According to Plaintiff, Benavides told him that the Company was "not in a position anytime soon to make Tax Distributions" but "could maybe buy [his]

---

[31] JX 23 at 4.

[32] JX 38 at 4.

[33] JX 45 at 6, 10.

[34] JX 64 at 94; Tr. (Bajaj) at 735:9–17.

[35] JX 85 at 1.

[36] JX 107 at 4.

[37] Tr. (Bajaj) at 677:16–678:2.

stock back at $0.50 on the dollar to help ease the pain," remarking that "I've been squeezed by firms worse in the past" and "I do not feel sorry for you."[38]  Benavides denies making those statements.

In May 2023, the Board terminated Plaintiff as CEO of DMI and hired Thurston to serve in his place.[39]  Under the terms of a separation agreement, OceanSound agreed to appoint Plaintiff as an OSP Director so that he would remain on the Board when he ceased to be the CEO Director.[40]

## G. DMI Management And The OSP Directors Assess The Company's Financial Position To Determine Whether To Recommend A Tax Distribution.

In the ordinary course, DMI's finance team prepared 13-week cash flow forecasts, which were provided to OceanSound to monitor the Company's performance.[41]  On June 20, DMI's CFO, Michael Altshuler, sent Benavides and Nordin an update on the Company's cash flow, explaining with respect to Tax Distributions that:

> All-in, we would need to send tax distr[ibutions] to the management razor partners in the range of $13M this year.  This is having a significant negative impact on our cash flow as you can imagine, and

---

[38] Tr. (Bajaj) at 678:21–679:1.  The only document purporting to describe this call is an email Plaintiff sent to himself nearly two years later—two months before filing his Complaint.  *See* JX 420.

[39] PTO ¶¶ 7, 13; Tr. (Bajaj) at 679:6–16.

[40] JX 297 at 7.

[41] Tr. (Benavides) at 80:13–81:8; *id.* (Nordin) at 312:10–22.  Nordin also received daily cash updates from DMI.  *Id.* at 314:13–24.

causing downward pressure beginning in August when our interest payment is due through the rest of year. We were already in a difficult cash position given our operational challenges, so this is driving additional challenges. The cash flow that [management] is sending has been updated to reflect the latest forecast.[42]

After reviewing the forecasts, Benavides' initial reaction was that the Company "should not be making [T]ax [D]istributions," and he asked Nordin for input from PricewaterhouseCoopers ("PwC"), which OceanSound had engaged to improve the tax structure of its acquisitions.[43]

On June 26, Nordin told Altshuler that "we are going to recommend that we don't make a [T]ax [D]istribution to shareholders" for 2022 because "[w]e do not think the company has enough cash flow to do that right now."[44]

In early July, Benavides sent other OceanSound partners an email describing PwC's recommendations and lessons learned from the tax issues the Rollover Members at DMI were facing:

> We've done a deep dive into the tax implications of partnership vs corporate structures due to a $7.8mm tax distribution due at DMI— which we're going to elect not to make. In short, there is almost always more current tax due under the partnership structure than under the corporate structure (unless the corporate rate exceeds the personal fed[eral] & state tax rates). A benefit of the partnership structure is that tax shields get passed forward but that may have limited value on a future sale. A theoretical benefit is that the tax distributions count as

---

[42] JX 73 at 1.

[43] *Id.*; Tr. (Benavides) at 91:17–92:12; *id.* at 93:12–24 ("So it was just a teaching moment to the team at OceanSound . . . .").

[44] JX 77 at 2.

return of principal which improve [internal rate of return] but the benefit doesn't move the needle.

Going forward unless there's an incredibly compelling and well documented/analyzed reason for using the partnership structure, we will only use fully blocked, corporate structures to set up new portfolio company investments. For example, if there's a very large [net operating loss] AND we have a good sense for what tax distributions will be for the forward 2-3 years AND our agreements have the flexibility to not make tax distributions, we can use partnership structure.

At DMI, we were fortunate to have complete flexibility to NOT make the payments, but it's a painful situation for the [Rollover Members].[45]

OceanSound's analysis of the Company's cash position continued into mid-July. On July 12, Altshuler sent Nordin a new forecast that modeled various distribution scenarios, recommending that the Company pay a 25% or 50% Tax Distribution:

Bottom line is the 0% and 25% scenario can be managed through working capital with no need to draw on line. The 50% is closer, and may result in very brief period of time where we could spring. 75% and 100% will definitely spring, and will likely not have enough cash going into next year to manage through the bonus and earnout without putting too much pressure. So my recommendation would be something between the 25% and 50% distr[ibution].[46]

Thurston responded, "[i]t would be good to cover a portion of this (25%-50% as Mike suggest[s])—if not for anything other than employee morale and the surprise

---

[45] JX 83 at 2.

[46] JX 85 at 1.

news of this matter."[47]   Nordin "agree[d] with what [Thurston] [was] saying," explaining that "[o]nce we have better visibility on the cash flow scenarios described below, we will be able to decide quickly."[48]

On July 14, however, Altshuler sent a "likely more realistic" updated cash flow projection, noting "[t]he one I saw earlier this week as I said was a bit on [the] aggressive side" while the updated forecast was "more in our current reality."[49] Altshuler explained that, "[b]ased on this current cash flow, I would exercise more caution."[50]

The next week, Altshuler told the Company's second-largest Rollover Member by equity ownership that management was "going to recommend to the [B]oard that we cannot fund [Tax Distributions] at this point given our current cash position."[51]  As Altshuler socialized the idea of not paying a Tax Distribution, he reminded Rollover Members "that the operating agreement only requires that we fund if we believe there is sufficient liquidity and there [i]s not[,]" explaining that "[s]ome large cash requirements are coming over the next 6-8 months, including a

---

[47] JX 87 at 2.

[48] *Id.* at 1.

[49] *Id.*

[50] *Id.*  The updated cash flow projection showed that if the Company paid a 25% partial Tax Distribution, it would have a negative $2.9 million cash balance in some weeks.  *Id.* at 4.

[51] JX 93 at 1; Tr. (Nordin) at 466:7–11; *see also* JX 95.

few large interest payments, the upcoming earnout payment, and the year-end bonus payment, all of which we need to manage through."[52]  He further explained:

> The above items, coupled with the significant rollover of legacy investors that are not able to take advantage of the tax shield[,] is creating the perfect storm of pressure on our near-term cash needs.  This is therefore putting us in [a] position where it is not prudent for me to recommend to the board that we fund the tax distributions until we get more visibility into some of these growth opportunities and are able to manage through these near-term cash headwinds.[53]

On August 3, Altshuler sent an updated 13-week cash flow forecast to OceanSound, noting significant upcoming payments:

> [Y]ou'll see that we can manage through March next year without accessing additional capital, but starting with March after bonus payment, we will need to pull as much as $20M additional off line at certain points b/w March and June, so will have in excess of $30M on line.  This is no growth model . . . .  Bottom line is that **we go into next year with no cash and $13M on the line**.  We have $8M in bonuses and $9M in earnout, so $17M, and another $2M in Simplex holdback payment.[54]

**H.     The Board, Including Plaintiff, Votes To Not Make A Tax Distribution For Tax Year 2022.**

On August 7, the Board held a special meeting to determine whether to pay Tax Distributions to the Rollover Members.[55]  In advance of the meeting, the Board received a "Board Update" presentation describing the Rollover Members' tax

---

[52] JX 103 at 1.

[53] *Id.* at 2.

[54] JX 105 at 2 (emphasis added).

[55] PTO ¶ 34; JX 119.

liability, including the factors that "resulted in a scenario where, despite DMI being in a taxable loss position of $10m, the management aggregator ultimately end[ed] up with income and a tax bill."[56] The Board Update explained that:

> Under the holding/operating company's limited liability company agreement, DMI is required to make [T]ax [D]istributions to its shareholders to cover projected tax liability if distributions for that year are not sufficient to cover that projected tax liability, unless the board determines that the company does not have sufficient liquidity to support [T]ax [D]istributions[.]
>
> - Due to add-on acquisition expenses, low organic bookings and high restructuring charges, DMI has drawn its revolver to $13.5m (out of $40m capacity) and currently has mid-single digit cash on hand. DMI also has ~$25m of non-operating cash expenses expected to come out of the company over the next 12 months and could further strain liquidity[.]
>
> - As a result, the DMI management and the OSP [Directors] recommend that the DMI board does not cause the company to make any distributions to shareholders until there is improved liquidity.[57]

At the meeting, members of management provided an overview of the Rollover Members' tax burden and the Company's financial position, and Board members asked questions.[58] The Board, including Plaintiff, unanimously voted not to make any Tax Distributions for tax year 2022.[59]

---

[56] JX 106 at 4.

[57] *Id.*

[58] JX 119.

[59] *Id.* at 5.

17

Two months later, on October 5, Plaintiff sent a letter to the Board "regarding the issue of [the Company's] distribution obligations to its Members under Section 6.6 of the [Operating Agreement]."[60] The letter asserted that, "[a]lthough I voted [at the August 7 Board meeting], together with the majority of the Board, in favor of adopting the recommendation of DMI management and the OSP [Directors] that the Board not cause DMI to make any distributions to shareholders until there is improved liquidity, our Board discussion left a number of questions unaddressed."[61] Plaintiff asked "[a]t what point will [the Company] have reached sufficiently 'improved liquidity' such that [the Company] will resume fulfilling its obligation to make the required [T]ax [D]istributions," and whether "future [T]ax [D]istributions [would] . . . include amounts sufficient to cover any and all interest and penalties incurred by [Rollover Members] . . . ."[62] Plaintiff also "request[ed] that DMI management provide updates to the Board on a monthly basis that address the Company's then-current cash position, so that Board members can assess when it would be appropriate for DMI to resume fulfilling its tax distribution obligations under the [Operating] Agreement and, at the appropriate time, to vote to resume fulfilling those obligations."[63] In response to Plaintiff's questions about the

---

[60] JX 134 at 2.

[61] *Id.*

[62] *Id.* at 2–3.

[63] *Id.* at 3.

Company's liquidity, DMI's management began sending its 13-week cash flow forecasts to Plaintiff, in addition to other regular reporting.[64]

Plaintiff claims that during a Board meeting in September, Benavides stated that he would reconsider making Tax Distributions only if the Company exceeded a "20MM quarterly EBITDA threshold."[65] Benavides denies making this statement. According to Plaintiff, in late October, he called Benavides for more clarity on this threshold. When Plaintiff explained that the lack of distributions was "very painful," Benavides purportedly replied: "I can either pay your tax distributions or I can pay your earnout. But not both. So you choose."[66] Plaintiff also claims that Benavides asked him if he would "consider converting [his] earnout into equity."[67]

## I. Plaintiff Continues To Push For Tax Distributions Despite The Company's Unimproved Cash Position, And OceanSound Removes Him From The Board.

The Company's cash position did not markedly improve over the next several months. On January 30, 2024, Altshuler told Nordin there was "no other way to put

---

[64] *See, e.g.*, JX 152; JX 156; JX 160; JX 165; JX 190; JX 192; JX 196; JX 208; JX 211; JX 213; JX 215; JX 218; JX 223; JX 226; JX 231; JX 238; JX 243; JX 245; JX 253; JX 256; JX 258; JX 261; JX 267; JX 272; JX 277; JX 281; JX 283; JX 286; JX 310; JX 317; JX 320; JX 323; JX 326; JX 329; JX 331.

[65] Tr. (Bajaj) at 682:1–12.

[66] *Id.* at 684:20–685:2.

[67] *Id.* at 685:3–6.

it[,] we will miss our numbers significantly. . . . [I] unfortunately don't need a crystal ball to say this. [E]ntirely self[-]inflicted."[68]

The Board terminated Altshuler as DMI's CFO and replaced him with Peter Carlson.[69] In February, Ken Bajaj left the Board.[70]

In the first half of 2024, Plaintiff continued to press for a Tax Distribution. On a May 10 call, Nordin told Plaintiff that "we very clearly have cash tightness and that our #1 priority is to dig out of this hole."[71] When Benavides learned of the call, he asked Nordin if Plaintiff had "thought about selling us his equity? They can take legal action, and we'll hose them."[72] Plaintiff says that on another call in June, Benavides told him that "we do not plan or intend on making any tax distributions. Maybe you should consider selling your equity back at a discount."[73] Plaintiff then texted another Rollover Member "to setup a call to debrief you guys on [Benavides'] stance on the tax and his offer to buy equity back at a discount."[74]

On August 19, Plaintiff sent a letter to Benavides addressing "the Board's continued failure to authorize [the Company]'s quarterly tax distributions" to the

---

[68] JX 194 at 2.

[69] PTO ¶¶ 14, 15; Tr. (Nordin) at 383:7–14.

[70] PTO ¶ 12.

[71] JX 242 at 2.

[72] *Id.* at 1.

[73] Tr. (Bajaj) at 688:8–10.

[74] JX 60 at 2.

Rollover Members and "a continued lack of transparency with respect to [the Company]'s intent and ability to make those required distributions," among other issues.[75] Plaintiff's letter claimed that "[o]n September 19, 2023 . . . [Benavides] informed the Board that no [T]ax [D]istributions would be made to the Members until [the Company] begins recording EBITDA of at least $20 million on a quarterly basis."[76]

On August 26, Benavides sent a letter responding to Plaintiff's August 19 letter, which asserted, among other things, that:

> Given that the Company's liquidity position and indebtedness have deteriorated since July 2023 . . . , the Board has had, and continues to have, ample basis for its discretionary determination that its reasonable cash reserves needed exceed the cash available and that Tax Distributions are therefore not required under the [Operating Agreement].[77]

The letter further responded that Plaintiff's "assertion that the Board has imposed a threshold of achieving $20 million in quarterly EBITDA prior to any Tax Distributions is incorrect."[78]

---

[75] JX 287. The letter is dated August 16 but was sent on August 19.

[76] *Id.* at 3.

[77] JX 297 at 3–4.

[78] *Id.* at 4.

In addition, Benavides' August 26 letter notified Plaintiff that OceanSound had determined to "terminat[e] [Plaintiff's] status as its designee board member, effective immediately."[79]

### J.    Plaintiff And Altshuler Request A Buyout.

In September, Altshuler asked Nordin "to socialize a potential buyout with the powers that be if that is a possibility."[80]  According to Altshuler's notes, Altshuler told Nordin that a discount of "$.50 on [the] dollar for investment . . . was low" but between "50 cents and $1.3 [wa]s a reasonable discussion."[81]

On October 25, Plaintiff sent a letter responding to Benavides' August 26 letter.[82]  Plaintiff concluded his letter by requesting that OceanSound buy out the Rollover Members' shares:

> Given your positive outlook on the investment, our concerns about the investment, and our lack of utility to DMI, if we cannot agree to a meaningful path of course correction, I believe consideration of a negotiated buy-out of our Class A Shares and a corresponding forfeiture of all of our rights under the Class A Agreement is warranted, as I believe it would be in the best interests of both the Class A Rollover Shareholders and OSP.[83]

---

[79] *Id.* at 7.

[80] JX 308 at 2.

[81] JX 147 at 6.

[82] JX 336 at 1.

[83] *Id.* at 6.

The same day, another partner at OceanSound emailed Nordin requesting "the language in the [Operating Agreement] around buyback rights for [Plaintiff]'s equity[.]"[84] At some point, OceanSound purportedly prepared internal documents modeling a buyout of the Rollover Members "at [a] 50% discount, and current [management] at cost."[85]

**K.      The OSP Directors Execute A Written Consent Ratifying The Board's Decisions To Not Make Tax Distributions Through September 2024.**

On November 1, OSP Directors Benavides, Nordin, Kelly, and Coons executed a written consent to "ratify and approve [the Company's] decision not to make Tax Distributions in respect of the fiscal quarters ending March 31, 2022 through September 30, 2024" (the "November 1 Written Consent").[86] The November 1 Written Consent recounted:

> [T]he Board has previously determined in various meetings beginning on August 7, 2023, and has now again determined, in its good faith discretion that, after considering the Company's operating performance and trends, liquidity position, outstanding indebtedness, total leverage ratio, interest and earnout obligations, and cash flow forecasts, among other factors, the Company has historically not had in any fiscal quarter, and does not have in the current fiscal quarter, any cash available after taking into account reasonable reserves for purposes of making Tax Distributions.
> . . .

---

[84] JX 335.

[85] JX 510 (undated document); *see* JX 509; JX 511.

[86] JX 343 at 1.

> [T]he Company does not have, and has not had at any time during the fiscal quarters ending March 31, 2022 through September 30, 2024 and through the present, any cash available after taking into account reasonable reserves and shall not make any Tax Distributions in respect of the fiscal quarter ending December 31, 2024.[87]

The November 1 Written Consent resolved "that the Company's decision not to make any Tax Distributions in respect of the fiscal quarters ending March 31, 2022 through September 30, 2024 is hereby ratified and approved."[88]

Altshuler spoke with Nordin again about a potential buyout in December.[89] Altshuler told Nordin that "we would love to discuss a negotiated settlement, even if it had a small discount."[90] Nordin then purportedly "said [Altshuler] should wait until the commercial sale is finalized, and then wait about 30 days, and then come back and we could discuss."[91]

## L. DMI Pays Down Debt With Proceeds From The Sale Of Its Commercial Division.

In the first half of 2024, the Company began to consider selling its commercial division as a way to service the roughly $300 million in debt it had incurred.[92] By

---

[87] *Id.* at 4.

[88] *Id.* at 5.

[89] JX 147 at 7.

[90] *Id.*

[91] *Id.*

[92] Tr. (Benavides) at 122:3–13; *id.* (Nordin) at 391:4–392:11; *id.* (Thurston) at 571:21–572:14; *id.* (Carlson) at 649:1–650:2.

24

early 2025, the Company had a Consolidated Total Net Leverage Ratio of 5.00x,[93] which management felt was unsustainable.[94]

In February 2025, DMI sold its commercial division to nonparty Encora Inc. ("Encora") for $150.7 million.[95] The sale qualified as a "Disposition" under Section 2.8(c) of the Credit Agreement, requiring the Company to stay within its permitted Consolidated Total Net Leverage Ratio of 3.50 to 1.00. The Company projected that a sale at the purchase price before adjustments would cause the Company to exceed the permissible Consolidated Total Net Leverage Ratio.[96] As a result, the Company and its lenders under the Credit Agreement entered into a Limited Consent Agreement (the "Limited Consent") to raise the Consolidated Total Net Leverage Ratio threshold to 3.75 to 1.00.[97] After closing, however, the Company's actual Consolidated Total Net Leverage Ratio was only 3.24x.[98]

The Company incurred transaction-related expenses, including a $5 million Transaction Fee to OceanSound,[99] fees for legal and financial advisors, transaction

---

[93] Tr. (Carlson) at 649:6–650:2.

[94] *Id.*; *see also id.* (Benavides) at 122:18–123:1.

[95] PTO ¶ 36; JX 455 at 27.

[96] Tr. (Nordin) at 394:4–21.

[97] PTO ¶ 37; JX 381 at 1.

[98] JX 455 at 27.

[99] Tr. (Benavides) at 274:3–7.

bonuses to employees, and other payments to vendors.[100]   After expenses, the Company used the remaining sale proceeds to pay down $124.4 million of the Term Loan and $27 million of the Revolver.[101]

### M.   Plaintiff Appoints A New Rollover Director To The Board.

Sometime after Ken Bajaj left the Board in February 2024, Plaintiff designated Rob Hanson to fill the Rollover Director vacancy.  In February 2025, Benavides met with Hanson to discuss his role on the Board.[102]

Hanson hoped to gain experience serving as a director.  In his Complaint, Plaintiff alleged that Benavides told Hanson at this meeting: "I am the [B]oard, and I make all the decisions, and I decide if we want to even have [B]oard meetings or not."[103]   But at trial, Hanson did not recall that exchange.  Instead, Hanson remembered Benavides "sp[eaking] authoritatively when he said there may never be a [B]oard meeting, meaning [Hanson] may never get the experience that [he] want[ed] out of this, so [Hanson] [did not] really want to do this."[104]

---

[100] JX 379.

[101] PTO ¶ 38.  I note that $124.4 million plus $27 million exceeds the $150.7 million consideration received in the transaction, but the parties have stipulated that these are the correct amounts.

[102] Tr. (Hanson) at 14:9–13; *id.* at 14:24–15:5.

[103] Compl. ¶ 20.

[104] Tr. (Hanson) at 26:12–19.

According to Hanson, during this February meeting, Benavides expressed his desire for the Rollover Members to "go away"[105] and "focus on their new business ventures."[106]

Hanson joined the Board in April 2025 and continues to serve as a director.[107]

### N. Plaintiff Claims OceanSound Made Him A Lowball Buyback Offer.

In May or June 2025, Plaintiff called Benavides one last time, "hat in hand," and "ask[ed] [him] as a man . . . for the sake of [Plaintiff's] family" to "please consider making a [T]ax [D]istribution" so that Plaintiff would not be "financially ruined."[108]  According to Plaintiff, Benavides told him he was "happy to hear . . . you realize that this decision is in my sole discretion and I'm in control," and that Plaintiff should "consider selling [his] stock back at a discount" representing "50 cents on the dollar."[109]

On June 27, Nordin emailed Benavides an internal estimate showing that the Rollover Members faced a 2025 pass-through tax exposure "as high as ~$9m, of which 95% is [Plaintiff]'s."[110]  Benavides told Nordin to "ask [Gibson Dunn &

---

[105] *Id.* at 26:21–24.

[106] *Id.* at 27:2–7.

[107] *Id.* at 32:6–11.

[108] *Id.* (Bajaj) at 702:2–20.

[109] *Id.* at 702:21–703:16.

[110] JX 424 at 1.

Crutcher LLP] to send a recommendation / process for offering the shareholders $1 for their equity to help them w[ith] the tax bill."[111]

### O. The Company Estimates One-Time Expenses Could Bring Its Cash Position Below Zero By The End Of December 2025.

On September 4, the Board held a quarterly meeting. In advance of the meeting, the Board received a presentation (the "September Board Deck").[112] The September Board Deck included a "Capital Structure Overview" showing the Company was estimated to have $17.6 million of cash on hand in December 2025, which "d[id] not include the potential impact of several large one-time expenses [that] could bring the balance below zero[.]"[113]

One such expense was a $5 million reserve for "Shareholder litigation defense"—the costs for defending this action.[114] Another estimated expense was a "$20m exposure" for an "Encora indemnity claim,"[115] a claim the Company eventually settled for approximately $20 million.[116]

---

[111] *Id.*

[112] JX 455 at 1–2.

[113] *Id.* at 27.

[114] *Id.*

[115] *Id.*

[116] Tr. (Nordin) at 496:7–13; *id.* (Thurston) at 594:21–595:1.

**P.** **The Company's Forecasted Cash Balances Remained Low Between 2023 And 2025.**

Between September 2023 and September 2025, the Company's average minimum forecasted cash balance was $2.1 million, with a median of approximately $1.4 million, as reflected on the following chart prepared by Defendant's expert, Dr. Michael T. Cliff:[117]



**Figure 1: Minimum Forecasted Cash Balance**
*September 25, 2023 – September 29, 2025*

[118]

---

[117] JX 484 [hereinafter Cliff Report] ¶ 52. Dr. Cliff holds a Ph.D. in finance from the University of North Carolina at Chapel Hill and is a Managing Principal at Analysis Group, an economic consulting firm. Tr. (Cliff) at 934:3–8, 935:22–936:9. Dr. Cliff provided an expert opinion on whether the Company had cash available to make Tax Distributions. *Id.* at 938:13–19.

[118] Cliff Report ¶ 52, Fig. 1.

Several factors impacted the Company's volatile cash position, including payments at different intervals on the Term Loan, the PIK Note, the Management Consulting Agreement, earnout payments, and employee compensation.[119] Low revenue growth and rising interest rates on the Company's variable-rate debt added additional stress.[120]

While the Company's forecasted cash balances began to recover in 2025, they still dipped below $1 million on September 22, 2025.[121]

As an additional test of the Company's ability to make Tax Distributions, Dr. Cliff compared each year's Tax Distribution liability against ending cash balances from the Company's 13-week cash forecasts.[122] That analysis showed that if the Company had paid the full amount of Tax Distributions as they came due, it would have had a negative weekly ending cash balance several times over the 24-month period between September 2023 and October 2025.[123]

## Q. Procedural History

On August 27, 2025, Plaintiff initiated this action through the filing of a Verified Complaint for Equitable Relief (the "Complaint"), accompanied by a

---

[119] *Id.* ¶¶ 36–40.

[120] *See id.* ¶¶ 44–45.

[121] *Id.* ¶ 52.

[122] Tr. (Cliff) at 972:23–973:9; *see also* Def.'s Expert Demonstrative at slide 17, Dkt. 117.

[123] Tr. (Cliff) at 973:22–24; Def.'s Expert Demonstrative at slide 17.

motion for expedited proceedings (the "Motion to Expedite").[124]  The Complaint alleges a single count seeking specific performance of the Company's obligation under Section 6.6 of the Operating Agreement to pay Tax Distributions for years 2022 through 2025.

In the Complaint and the Motion to Expedite, Plaintiff represented that "[w]ithout immediate relief, Plaintiff will be required to forfeit his equity . . . given the magnitude of the tax burden."[125]  At a September 17 hearing on the Motion to Expedite, the Court nonetheless denied Plaintiff's request for a trial on the merits in three months, in part because "[P]laintiff was aware of the [C]ompany's refusal to make [T]ax [D]istributions years before he filed suit."[126]  The Court instead ordered the parties to proceed to a trial "promptly" in the first or second quarter of 2026.[127]

The Court held a three-day trial from April 13 through April 15, 2026.[128]  The parties completed post-trial briefing on June 30.[129]  Post-trial oral argument is unnecessary.

---

[124] Compl.; Pl.'s Mot. to Expedite Proceedings, Dkt. 1.

[125] Compl. ¶ 12.

[126] Dkt. 16 at 25.

[127] *Id.*

[128] Dkt. 102.

[129] Pl.'s Post-Trial Br. [hereinafter POB], Dkt. 114; Def.'s Answering Post-Trial Br. [hereinafter DAB], Dkt. 121; Pl.'s Post-Trial Reply Br. [hereinafter PRB], Dkt. 126.

## II. ANALYSIS

In the sole count of the Complaint, Plaintiff seeks an order directing the Company to specifically perform its contractual obligation under Section 6.6 of the Operating Agreement to pay Tax Distributions for years 2022 through 2025 to the Rollover Members.[130]

"[S]pecific performance is 'a remedy for a proven breach of contract.'" *S'holder Representative Servs. LLC v. Renesas Elecs. Corp.*, 2024 WL 5192070, at *20 (Del. Ch. Dec. 3, 2024) (emphasis omitted) (quoting *26 Cap. Acq. Corp. v. Tiger Resort Asia Ltd.*, 309 A.3d 434, 464 (Del. Ch. 2023)). To prove a claim for breach of contract, a plaintiff must show: (1) the existence of a contract; (2) a breach of an obligation imposed by that contract; and (3) resulting harm. *Thomas v. Am. Midstream GP, LLC*, 2024 WL 5135828, at *5 (Del. Ch. Dec. 17, 2024), interlocutory appeal refused, 339 A.3d 752 (Del. 2025) (TABLE). "A party seeking to enforce a contract must prove each element of its breach of contract claim by a preponderance of the evidence." *Kuramo Cap. Mgmt., LLC v. Seruma*, 2024 WL 1888215, at *29 (Del. Ch. Apr. 30, 2024). "Proof by a preponderance of the evidence means proof that something is more likely than not. It means that certain evidence, when compared to the evidence opposed to it, has the more convincing force and

---

[130] Plaintiff now also argues that he is entitled to expectation-interest damages, including prejudgment interest, although the Complaint did not make this request.

makes you believe that something is more likely true than not." *Agilent Techs., Inc. v. Kirkland*, 2010 WL 610725, at *13 (Del. Ch. Feb. 18, 2010) (quoting *Del. Express Shuttle, Inc. v. Older*, 2002 WL 31458243, at *17 (Del. Ch. Oct. 23, 2002)).

Plaintiff contends the Company breached Section 6.6 in two ways: first, by failing to pay Tax Distributions from "cash available after taking into account reasonable reserves as determined in the good faith discretion of the Board"; and second, by failing to make commercially reasonable efforts to ensure that financing documents allowed for Tax Distributions. Alternatively, Plaintiff alleges that the Company breached the implied covenant of good faith and fair dealing. Plaintiff failed to prove a breach under any of these theories.

A. **The Board Determined In Good Faith That The Company Lacked "Cash Available After Taking Into Account Reasonable Reserves" From Which To Pay A Tax Distribution.**

Section 6.6 of the Operating Agreement requires the Company, "subject to having cash available after taking into account reasonable reserves as determined in the good faith discretion of the Board, [to] make quarterly advance [Tax] [D]istributions to each Member."[131] Stated differently, the Company must pay Tax Distributions unless the Board determines in its good faith discretion that the Company lacks "cash available after taking into account reasonable reserves" from

---

[131] OA § 6.6.

33

which to pay the distributions.[132]  Further, under Section 4.7(c) of the Operating Agreement, the Board is "conclusively presumed" to have acted in good faith if it is "acting on behalf of the Company" and "a majority of the Directors participating in the decision[] subjectively believes that" the decision "is in or is not opposed to the best interests of the Company."[133]

Putting Sections 6.6 and 4.7(c) together, to prove that the Company breached its obligation to pay Tax Distributions, Plaintiff had to show that the Board did not act in good faith when deciding that the Company lacked "cash available after taking into account reasonable reserves," meaning a majority of the Board *subjectively believed* that its determination was not in and *was opposed to* the best interests of the Company.  That is a high bar Plaintiff did not come close to meeting based on the trial record summarized above.  As explored in more detail herein, many of Plaintiff's theories at trial lost sight of the highly deferential contractual definition of good faith under Section 4.7(c).  For instance, a conclusive presumption of good faith applies when a *majority* of the Board subjectively believes that its decision is in or is not opposed to the best interests of the Company, yet Plaintiff focused on Benavides' subjective belief, largely ignoring that the Board included up to six other

---

[132] *Id.*

[133] *Id.* § 4.7(c).

34

directors.[134]   Moreover, bad faith requires a subjective belief that a decision is *opposed to* the best interests of the Company, but the record does not contain one iota of evidence that any director actually intended to *harm* the Company.[135]

Of course, none of the Board members who testified at trial admitted to a subjective belief that the Board's decisions were opposed to the best interests of the Company.   Benavides testified that he "[a]bsolutely" "tr[ied] to act in the best interests of the [C]ompany"[136] and that he believed "[t]he company did not have the ability to make [T]ax [D]istributions"[137] and doing so "would have a significant negative impact on the company cash flow" because "the [C]ompany didn't have the cash" to pay them.[138]   Benavides insisted that "[t]he full [B]oard discussed [whether Tax Distributions should be made] a number of times" but concluded the Company did not "have sufficient cash available to make [T]ax [D]istributions."[139]   Nordin

---

[134] *See* DAB at 43 ("Plaintiff has not demonstrated (and cannot demonstrate) that any member of the Board—*let alone a majority of the Board*—acted in bad faith by determining that the Company was unable to make tax distributions." (emphasis added)).

[135] *See id.* ("Plaintiff has presented no theory as to how deciding to keep cash in a struggling company instead of making distributions could possibly amount to a decision not in the company's best interests."); *id.* at 64 ("OceanSound, as the Company's largest investor, has the most to lose if the Company performs poorly.  Plaintiff has not explained why OceanSound would want the Company to perform poorly just to hurt Plaintiff.").

[136] Tr. (Benavides) at 73:4–7.

[137] *Id.* at 119:11–15.

[138] *Id.* at 87:5–10.

[139] *Id.* at 95:14–18, 113:18–20.

similarly testified that he "th[ought] that withholding [T]ax [D]istributions was in the best interest of the [C]ompany,"[140] that it was "very clear to [him] that the operations of the [C]ompany needed . . . proceeds and taking any out for distributions was not in the best interest of the [C]ompany,"[141] that he believed a partial Tax Distribution "could not have been made,"[142] and that "[T]ax [D]istribution payments would have a significant negative impact on company cash flows."[143] That testimony was, by and large, credible.[144]

Although credibility plays an important role in the subjective bad faith determination, the Court must also look to objective facts to reach a conclusion about the Board's intent. For instance, some conduct is "so egregiously unreasonable" that it is "essentially inexplicable on any ground other than bad faith." *Allen v. Encore Energy P'rs, L.P.*, 72 A.3d 93, 107 (Del. 2013) (quoting *Parnes v. Bally Ent. Corp.*, 722 A.2d 1243, 1246 (Del. 1999)). Further, bad faith may be inferred where

---

[140] *Id.* (Nordin) at 390:9–14.

[141] *Id.* at 395:17–24.

[142] *Id.* at 374:14–17.

[143] *Id.* at 327:10–13.

[144] Although Plaintiff insists that Benavides and Nordin are untrustworthy, POB at 40–42, I largely found their trial testimony on the Company's financial position, including the availability of cash to pay Tax Distributions, to be credible. I acknowledge that the parties offer different perspectives on conversations that occurred between them, and I believe the truth of what was said probably lies somewhere in the middle. But on the question of the Company's finances, I am convinced that Benavides and Nordin subjectively believed the Company did not have sufficient cash to pay a Tax Distribution.

"objective facts indicat[e] that a transaction was not in the best interests of the [company] and that the directors knew of those facts." *Id.*

On the other hand, merely second-guessing the Board's business judgment will not support a finding of bad faith. *See Chatham Hldgs. VI, LLC v. Hermida*, 2024 WL 4929756, at *6 (Del. Ch. Dec. 2, 2024) ("Mere disagreement with the Board's ultimate decision . . . does not show bad faith by the Board members." (quoting *In re Crimson Inc. Expl. S'holder Litig.*, 2014 WL 5449419, at *23 (Del. Ch. Oct. 24, 2014))); *Flannery v. Genomic Health, Inc.*, 2021 WL 3615540, at *25 (Del. Ch. Aug. 16, 2021) (finding that "mere disagreements with how the [b]oard negotiated the [m]erger" did not support "an inference of bad faith conduct"). "The fact that the plaintiff might object to what the [Board] did or argue that the [Board] should have proceeded differently w[ill] not undermine the [Board]'s subjective good faith." *In re El Paso Pipeline P'rs, L.P. Deriv. Litig.*, 2015 WL 1815846, at *16 (Del. Ch. Apr. 20, 2015). If the Board "reached a rational decision for comprehensible reasons," even an imperfect process will not demonstrate subjective bad faith. *See id.*

The objective evidence adduced at trial does not undermine the credibility of Benavides' and Nordin's testimony. As explained below, each of Plaintiff's arguments challenging the Board's good faith determinations that the Company lacked "cash available after taking into account reasonable reserves" to pay Tax

Distributions fails on the factual record developed at trial. The record does not support Plaintiff's theory that the Board withheld Tax Distributions as a pretext to buy out the Rollover Members' shares. Plaintiff failed to prove that the Board never made "predicate" decisions regarding available cash before withholding Tax Distributions. The Company's cash position does not support a finding of bad faith, nor does the Board's decision not to take on additional debt. Plaintiff failed to prove that the Board or Benavides treated Section 6.6 as "optional" or applied the wrong standard when deciding whether to make Tax Distributions. And the OSP Directors' purported "rewrite" of Board meeting minutes does not show bad faith.

1. **Plaintiff Failed To Prove That The Board Withheld Tax Distributions As A Pretext To Force A Buyout.**

Plaintiff's primary theory of bad faith is that the OSP Directors caused the Board to withhold Tax Distributions as a pretext to force a buyout of the Rollover Members' equity. On the pleadings, this theory offered a logical explanation for why the Board might withhold Tax Distributions otherwise due, but it did not prove up at trial.

When Plaintiff filed this action, he supported his request for breakneck expedition by insisting that Benavides was single-handedly causing the Board to withhold Tax Distributions to "squeeze [him] out," knowing Plaintiff faced a "guillotine under which [he] [would] either surrender his equity, or face personal

38

financial ruin from the tax liability created by the phantom income."[145]  But heads never rolled as Plaintiff largely abandoned this theory at trial.  Contrary to Plaintiff's earlier narrative, the trial record showed Benavides had no reason to believe Plaintiff could be pressured into a buyout, given his substantial financial resources from other sources.[146]  Plaintiff engaged in extravagant spending throughout 2023 and 2024,[147] and still paid his taxes without selling any equity.[148]

Beyond the insincerity of Plaintiff's "squeeze" theory, the record does not support a finding that the Board withheld Tax Distributions as a pretext to force a buyout.  Plaintiff claims that Benavides made lowball offers to purchase his equity that "became more steeply discounted" as Plaintiff "refused to capitulate" to Benavides' overtures.[149]  The primary support for this theory is Plaintiff's own self-

---

[145] Compl. ¶¶ 12, 71.

[146] Tr. (Bajaj) at 702:2–20.  Plaintiff testified that he did not believe Benavides "understood the gravity of the dollar amounts [or the tax burden] and what that meant to [Plaintiff's] personal financial situation" until "[a]fter the commercial sale," around mid-2025.  *Id.* at 763:18–765:8.

[147] *Id.* at 758:12–760:21 (testifying that Plaintiff spent millions of dollars on a fleet of luxury cars, including two Rolls-Royces and a Lamborghini; bought a new home in Maryland for almost $10 million in the same town where he already owned an approximately $4 million home; and launched a new investment company called DigiCap, through which Plaintiff invested more than $15 million of his personal funds).  Plaintiff took delivery of the Lamborghini, which he described as an "investment," in January 2026.  *Id.* at 760:19–761:2.

[148] *Id.* at 748:3–8.

[149] POB at 14, 36.

serving recollection of oral discussions that Benavides largely disputes. Plaintiff claims that:

- On an April 2023 phone call, Benavides told Plaintiff that the Company was "not in a position anytime soon to make Tax Distributions" but "could maybe buy [his] stock back at $0.50 on the dollar to help ease the pain," remarking that "I've been squeezed by firms worse in the past" and "I do not feel sorry for you."[150]

- On an October 2023 phone call, Benavides told Plaintiff: "I can either pay your tax distributions or I can pay your earnout[,] [b]ut not both[,]" and asked Plaintiff if he would "consider converting [his] earnout into equity."[151]

- Plaintiff alleges that Benavides said in a February 2025 meeting with Hanson: "I am the board, and I make all the decisions, and I decide if we want to even have board meetings or not."[152]

- On a call in May or June 2025, Benavides told Plaintiff he was "happy to hear . . . you realize that this decision is in my sole discretion and I'm in control," and Plaintiff should "consider selling [his] stock back at a discount" representing "50 cents on the dollar."[153]

I am not convinced that Plaintiff is a reliable narrator when it comes to his oral conversations with Benavides.[154] In one instance, Plaintiff purported to create

---

[150] *See supra* note 38; JX 420.

[151] Tr. (Bajaj) at 684:20–685:6.

[152] Compl. ¶ 20.

[153] Tr. (Bajaj) at 701:1–703:16.

[154] In his Complaint, Plaintiff alleged that Benavides told Hanson at a February 2025 meeting: "I am the board, and I make all the decisions, and I decide if we want to even have board meetings or not." Compl. ¶ 20. But at trial, Hanson only remembered

40

an email record of a call two years after it happened.[155] He claimed in his pleading that Benavides made strident comments that the participant in that meeting failed to corroborate at trial.[156] He also grossly exaggerated his need for expedited relief to avoid "personal financial ruin."[157] I believe there is some kernel of truth in Plaintiff's testimony; I am, for instance, convinced that Benavides felt little sympathy for the plight caused by Plaintiff's failure to set aside a tax reserve out of the $70 million he received from the DMI sale. However, I put little stock in Plaintiff's claim that Benavides told him Tax Distributions would be made "in [his] sole discretion" in disregard of the Operating Agreement.

Moreover, even accepting Plaintiff's testimony, the record does not support his theory that the Board's decisions concerning available cash and reserves were driven by a plan to force a discounted purchase of the Rollover Members' shares, rather than a good faith assessment of the Company's ability to pay a Tax Distribution. As set forth in detail above, some Rollover Members, including Plaintiff and Altshuler, asked for a buyout.[158] OceanSound internally evaluated the

---

Benavides "sp[eaking] authoritatively" and did not confirm those statements. Tr. (Hanson) at 26:12–19.

[155] *See supra* note 38; JX 420.

[156] *See supra* pp. 26–27; Tr. (Hanson) at 26:12–19.

[157] Compl. ¶ 71.

[158] JX 308 at 2; JX 336 at 6.

concept but decided that the Rollover Members would not be interested in its low valuations.[159] As a result, OceanSound never made a formal offer to purchase Plaintiff's shares.[160]

At the same time (and as discussed in more detail below), the record shows that the OSP Directors were evaluating the Company's cash position throughout the period Plaintiff contends they were pursuing a buyout. The OSP Directors worked closely with management on a daily basis to understand the Company's cash position, and the contemporaneous record shows an earnest focus on liquidity,[161] liabilities coming due,[162] and "cash tightness."[163] Plaintiff therefore did not prove that the Board's determinations were a bad faith ruse to force a buyout.

> **2.** **The Board Made Determinations Of "Cash Available After Taking Into Account Reasonable Reserves."**

Plaintiff's next contention is that the Company breached Section 6.6 because the Board did not hold formal quarterly meetings to determine if the Company had "cash available after taking into account reasonable reserves" to pay Tax

---

[159] JX 308 at 2; JX 336 at 6; JX 424 at 1 (asking for a recommendation "for offering the [Rollover Members] $1 for their equity to help them w[ith] the tax bill"); *see also* JX 509–11 (showing various buyout models purportedly prepared by OceanSound).

[160] Tr. (Benavides) at 106:22–24.

[161] JX 106 at 4; *see supra* note 64.

[162] JX 105 at 2.

[163] JX 242 at 1–2.

Distributions.[164]  Plaintiff argues that by not making the "predicate" determination of available cash to pay a distribution, the Board could not have made such a determination in good faith.  This argument fails because the record developed at trial shows the Board constantly monitored the Company's cash position and repeatedly decided that it could not make Tax Distributions.

As the detailed factual recounting above explains, the Board first held a special meeting on August 7, 2023, at which it determined the Company lacked available cash to pay Tax Distributions for 2022.[165]  The Board discussed Tax Distributions again at a meeting in September.[166]  In October, Plaintiff asked "management [to] provide updates to the Board on a monthly basis that address the Company's then-current cash position, so that Board members can assess when it would be appropriate for DMI to resume fulfilling its tax distribution obligations under the [O]perating Agreement."[167]  Management began supplementing its regular reporting with 13-week cash flow forecasts.[168]

The Board's monthly financial reporting packages included "bookings, backlog, income statement metrics, balance sheet metrics, [and] some employee

[164] POB at 28.

[165] PTO ¶ 34; JX 119.

[166] Tr. (Nordin) at 377:22–378:15.

[167] JX 134 at 3.

[168] *See supra* note 64.

43

headcount information."[169] The OSP Directors, comprising a Board majority, also received daily cash information from Company management, which they used to consider Tax Distributions.[170]

Plaintiff concedes that during this period, he and management "constantly" asked about Tax Distributions and the OSP Directors (a Board majority) repeatedly "said no."[171] In August 2024, for instance, Benavides responded to one of Plaintiff's requests with a letter that explained the Company's available cash did not support a Tax Distribution at that time:

> Given that the Company's liquidity position and indebtedness have deteriorated since July 2023 . . . , the Board has had, and continues to have, ample basis for its discretionary determination that its reasonable cash reserves needed exceed the cash available and that Tax Distributions are therefore not required under the [Operating Agreement].[172]

Three months later, in November 2024, the OSP Directors, constituting a majority of the Board, executed the November 1 Written Consent resolving to not

---

[169] Tr. (Nordin) at 315:3–22.

[170] *Id.* at 314:8–19; *see also id.* (Benavides) at 80:11–16, 81:14–19, 167:7–14, 204:6–12; *id.* (Thurston) at 561:10–20. *See also* PRB at 19 ("The decision-makers had daily cash visibility . . . .").

Plaintiff's position that the Board was required to make these determinations at formal meetings does not hold water. Section 4.2(a) of the Operating Agreement contemplates that "the Board shall meet at such times and at such places as may be necessary for the Company's business." OA § 4.2(a). There is no requirement for the Board to hold formal meetings on any particular schedule.

[171] POB at 27.

[172] JX 297 at 3–4.

pay Tax Distributions through December 31, 2024.[173]  The November 1 Written Consent memorialized that the Board had continually evaluated the Company's cash position and concluded that it lacked available cash to pay a distribution, explaining:

> [T]he Board ha[d] previously determined in various meetings beginning on August 7, 2023 . . . in its good faith discretion that, after considering the Company's operating performance and trends, liquidity position, outstanding indebtedness, total leverage ratio, interest and earnout obligations, and cash flow forecasts, among other factors, the Company has historically not had in any fiscal quarter . . . any cash available after taking into account reasonable reserves for purposes of making Tax Distributions.[174]

The November 1 Written Consent further confirmed that "the Company . . . [did] not ha[ve] at any time during the fiscal quarters ending March 31, 2022 through September 30, 2024 and through the present, any cash available after taking into account reasonable reserves."[175]

Plaintiff argues that the Board failed to make a determination of cash available to pay Tax Distributions in the first quarter of 2025, after closing on the sale of the Company's commercial division.  To the contrary, the Board constantly evaluated the Company's tax position and ability to pay Tax Distributions throughout the sale process.  The Company began considering a sale of the commercial division in early

---

[173] JX 343 at 4.

[174] JX 343 at 4.

[175] *Id.*

2024,[176] months before the November 1 Written Consent in which the Board determined the Company would not have cash available to pay a distribution through December 31.[177] A sale agreement was signed in December and closing occurred in February.[178] The Company used the sale proceeds after expenses to pay down debt.[179] After closing, the OSP Directors continued to review the Company's revised cash forecasts[180] and consider requests for Tax Distributions.[181] As the full tax implications of the commercial division sale crystallized, Carlson, DMI's CFO, also told the Rollover Members that the Company had "been hard at work optimizing DMI's tax situation."[182] In other words, contrary to Plaintiff's argument, the Board continually evaluated the Company's cash position and concluded that it lacked available cash to pay a Tax Distribution, including after the sale of the commercial division.

In short, the trial record refutes Plaintiff's contention that the Board never made a "predicate" determination of the Company's available cash before withholding Tax Distributions.

---

[176] Tr. (Benavides) at 107:8–11.

[177] JX 343 at 4.

[178] Tr. (Nordin) at 392:17–20.

[179] PTO ¶ 38.

[180] JX 386.

[181] JX 391.

[182] JX 424 at 3.

### 3. The Company's Cash Position Does Not Support A Finding Of Bad Faith.

Plaintiff devoted much of his briefing and trial time to arguing that the Board could not have decided in good faith that the Company lacked "cash available after taking into account reasonable reserves" to pay Tax Distributions because the Company did, in fact, have excess cash to pay a distribution at various times between 2022 and 2025.[183] Despite Plaintiff's disagreement with the Board's determination, evidence of the Company's available cash and reserves supports a finding that the Board reached a "rational decision for comprehensible reasons." *El Paso*, 2015 WL 1815846, at *16.

As laid out in greater detail above, the evidence adduced at trial shows that in mid-2023, the OSP Directors worked closely with DMI's management to assess the Company's cash position and make a recommendation on Tax Distributions to the full Board.[184] The OSP Directors studied different cash flow scenarios and considered partial and full distributions.[185] As they worked through the Company's cash position, DMI's CFO, Michael Altshuler, initially encouraged a distribution. But after sending "more realistic" updated cash flow projections, he instead

---

[183] POB at 23 (arguing that the Board's good faith must be "tested against actual cash and actual reserves" at the Company).

[184] *See supra* pp. 12–16.

[185] JX 87 at 1.

47

recommended that the Board exercise caution,[186] reasoning that the Company would be "go[ing] into next year with no cash and $13M on the [Revolver]" while owing "$8M in [employee] bonuses and $9M in earn[-]out" payments.[187]

On August 7, 2023, the Board met to consider Tax Distributions. Materials provided in connection with that meeting explained that:

- Due to add-on acquisition expenses, low organic bookings and high restructuring charges, DMI has drawn its [R]evolver to $13.5m (out of $40m capacity) and currently has mid-single digit cash on hand. DMI also has ~$25m of non-operating cash expenses expected to come out of the company over the next 12 months and could further strain liquidity[.][188]

At the meeting, the Board—including Plaintiff—unanimously determined that the Company lacked available cash and voted not to make a Tax Distribution for tax year 2022.[189] Plaintiff does not claim that this determination was made in bad faith.

The Company's financial position did not markedly improve after the August 7 meeting. Although Plaintiff claims that "by December 2023[,] cash had improved $10-15 million,"[190] Altshuler reported in January 2024 that the Company was on track to "miss [its] numbers significantly."[191] The Company continued to

---

[186] *Id.*

[187] JX 105 at 2.

[188] JX 106 at 4.

[189] JX 119 at 5.

[190] POB at 29.

[191] JX 194 at 2.

miss its revenue targets throughout 2024,[192] and by August 2024, the Company's debt exceeded $337 million.[193] When the OSP Directors executed the November 1 Written Consent memorializing the Board's determination that "the Company ha[d] historically not had in any fiscal quarter . . . any cash available after taking into account reasonable reserves for purposes of making Tax Distributions,"[194] the Company's cash position had not materially improved since August 2023.[195]

Indeed, when the Board voted in August 2023 to not pay Tax Distributions, the Company's balance sheet reflected approximately $2 million in cash. As illustrated in a report submitted by the Company's expert, Dr. Cliff, the Company's forecasted cash balance from September 2023 to October 2025 remained around the same level.[196] Dr. Cliff's report also showed that if the Board had authorized Tax Distributions totaling $9.2 million (the Company's cumulative tax obligation through 2024), the Company would have had a *negative* cash balance on several days between September 2023 and October 2025.[197] Declining to approve Tax

---

[192] *Id.*; JX 453 at tab "Financial Summary." The Company missed its revenue targets from September 2023 through October 2025. Cliff Report, Ex. 6.

[193] JX 328 (Financial Summary).

[194] JX 343 at 4.

[195] Tr. (Cliff) at 949:11–14, 952:12–14, 952:24–953:2, 955:8–23, 958:2–5 ("So we have our anchor point of August of 2023 where the company decided it needed to wait for improved liquidity. And this [graph] is basically showing that we're not there yet.").

[196] Cliff Report ¶ 52; Tr. (Cliff) at 959:5–19.

[197] Tr. (Cliff) at 973:22–24.

Distributions that could have resulted in negative cash balances suggests a rational determination, not bad faith.

Plaintiff argues that the Company could have made a Tax Distribution based on cash balances of $15.15 million at year-end 2023, $16.6 million at year-end 2024, and forecasted balance of approximately $17 million at year-end 2025.[198] This argument fails to account for other sizeable obligations for which the Company maintained reserves, including earnout payments, interest payments on debt, and employee bonuses.[199] As the September Board Deck's Capital Structure Overview expressly noted, although the Company expected to end 2025 with over $17 million in cash, that figure did not factor in several large one-time payments that could bring the cash balance below zero.[200]

Plaintiff second-guesses the Board's decision to use proceeds from the sale of DMI's commercial division to pay down debt instead of making Tax Distributions.[201] Plaintiff argues that the Company had "approximately $19.7 million of covenant capacity" at closing that should have been used to make a Tax Distribution instead of pay debt.[202] The Board's decision to allocate sale proceeds to reduce risk by

---

[198] POB at 28.

[199] JX 106 at 5; JX 119 at 4; JX 455 at 27.

[200] JX 455 at 27.

[201] POB at 16–17.

[202] *Id.* at 20.

deleveraging the Company does not evidence bad faith, *i.e.*, a subjective belief that the action taken would harm the Company. Similarly, the Board's decisions to set aside cash reserves to cover contractually mandated management fees, the Encora indemnity settlement, and this litigation likewise do not show bad faith. Section 6.6 does not require the Board to set aside a particular sum for reserves, nor does it dictate approved categories of reserves—the Board must make that determination in good faith. Plaintiff has not shown that setting aside reserves to pay these expenses evidences bad faith instead of ordinary business judgment.

Plaintiff's internal markup and future turnaround arguments are also unavailing. As recounted by Plaintiff,

> [Benavides] characterized DMI as significantly underperforming in 2023—testifying that 2023 profit was expected at approximately $90 million but achieved only in the low $40 million[,] described the bookings miss as a "panic type of moment," said "we should not be making tax distributions" in light of cash-flow concerns, described the financial circumstances as "not good" and the Company as "in a tunnel with no light at the end," and repeatedly used the language of "disaster" and "panic."[203]

Plaintiff says that position is inconsistent with OceanSound "mark[ing] up its investment in DMI in the 1.2x to 1.3x range from 2022 through the present."[204] According to Plaintiff, the Board "cannot credibly claim the [Company's] business

---

[203] *Id.* at 33 (internal citations omitted).

[204] *Id.* at 32.

was so acutely feeble and liquidity-constrained that mandatory distributions could not be made" when OceanSound remained bullish on DMI's prospects.[205] But OceanSound's internal valuation has little to do with the Company's available cash to pay Tax Distributions. Plaintiff emphasizes that the OSP Directors were optimistic about the Company's performance and growth prospects,[206] but, to state the obvious, optimism about future growth does not necessarily translate to available cash to pay a Tax Distribution in the near term.

To summarize, far from demonstrating bad faith, evidence of the Company's cash position shows the Board reached a rational decision with respect to available cash and reserves.

### 4. The Board's Decision Not To Take On Additional Debt To Pay Tax Distributions Does Not Show Bad Faith.

Plaintiff next argues that the Board acted in bad faith by failing to take on debt to fund Tax Distributions.[207] According to Plaintiff, "Section 6.6 does not say 'reasonable *cash* reserves'; it says 'reasonable reserves,'" implying the reserves

---

[205] *Id.*

[206] *See id.* ("On December 9, 2024—the same day OceanSound iterated buyout modeling internally—Nordin told Altshuler that 'the anxiety he shared with me when I was part of the business is no longer there, and he now feels a lot better about the business, b/c the growth opps are finally real.' On February 11, 2025, Nordin told Altshuler OceanSound expected a '2x return in 5 years.'" (internal citations omitted)).

[207] *See* POB at 17, 21, 26, 28.

could come from debt.[208]  Plaintiff faults the Board for preserving the Revolver instead of using it to pay Tax Distributions.[209]  Plaintiff points out that the Company "fund[ed] ordinary growth working capital from cash on hand while leaving substantial revolver capacity undrawn" and "claiming there was no cash for the [T]ax [D]istributions Section 6.6 mandated."[210]

Again, Section 6.6 of the Operating Agreement requires *the Board* to determine whether the Company has "cash available after taking into account reasonable reserves"; the only restriction on the Board's discretion is that it must make the decision in good faith.  Deciding not to incur additional debt to increase cash reserves is not indicative of bad faith.  Rather, "[t]he decision if, how and when to take on company debt is a quintessential function of the board of directors." *Equity-League Pension Tr. Fund v. Great Hill P'rs, L.P.*, 2021 WL 5492967, at *1 (Del. Ch. Nov. 23, 2021).  Second-guessing that decision does not show bad faith. *See In re Novell, Inc. S'holder Litig.*, 2013 WL 322560, at *8 (Del. Ch. Jan. 3, 2013) ("Bad faith is also not shown by disagreement with the Board's decisions . . . .").  Plaintiff has not shown the Board's debt strategy was outside the bounds of reason or otherwise indicative of an intent to harm the Company.

---

[208] *Id.* at 25 (emphasis added).

[209] *Id.* at 26.

[210] *Id.*

**5. Plaintiff Failed To Prove That The Board Treated Section 6.6 As "Optional" Or Applied The Wrong Standard.**

Plaintiff also argues that the Board applied the wrong standard for deciding whether to pay Tax Distributions, acting as if it had "complete flexibility" to withhold distributions that are mandatory under the Operating Agreement.[211]

Plaintiff bases this argument in part on a July 6, 2023, email in which Benavides told his partners at OceanSound that "[a]t DMI, we were fortunate to have complete flexibility to NOT make the [Tax Distribution] payments."[212] Taken in context, Benavides' email summarized PwC's tax advice and explained why OceanSound should be cautious in future investments involving a pass-through tax structure, which had resulted in "a painful situation for the rollover shareholders" at DMI.[213] His email did not purport to describe the standard the Board applied in determining whether to pay Tax Distributions, but to explain in colloquial terms that the Operating Agreement preserved the Company's flexibility to not pay distributions under the circumstances.[214]

Plaintiff also claims that Benavides told him that Tax Distributions would be paid "in [his] sole discretion" and insisted that the Company would not pay Tax

---

[211] POB at 24.

[212] *Id.* (quoting JX 83).

[213] JX 83 at 2.

[214] Tr. (Benavides) at 94:3–15; *id.* at 222:24–223:10 (testifying that this email was "poorly phrased").

54

Distributions until it achieved $20 million in quarterly EBITDA.[215]  Plaintiff failed to prove those statements were made and, as explained above, the Board based its determinations on available cash.

### 6. "Rewriting" The August 7, 2023 Minutes Does Not Show Bad Faith.

In a final attempt to establish bad faith, Plaintiff contends that Nordin's edits to the minutes of the August 7, 2023 Board meeting evidence bad faith.  Plaintiff claims that Nordin removed descriptions of Plaintiff's "questions about penalties and interest, Benavides' admission that consequences had 'not been considered,' and the CFO's cash-availability finding," as well as "language committing the Board to 'explore potential solutions which would eliminate the need for tax distributions.'"[216]  Plaintiff says the markup shows "the Board was not memorializing a good-faith reserve determination."[217]

This argument misses the mark.  The parties' disagreement about what was discussed at the August 7 meeting, or what level of detail the minutes should include, does not change the Court's assessment of the Board's good faith determination of "cash available after taking into account reasonable reserves" to pay Tax Distributions.

---

[215] Tr. (Bajaj) at 682:8–12, 702:21–24.

[216] PRB at 21; *see also* POB at 37.

[217] POB at 30–31.

55

*　　　*　　　*

None of Plaintiff's theories support a finding that the Board failed to act in subjective good faith when deciding if the Company had "cash available after taking into account reasonable reserves" to pay Tax Distributions. As a result, Plaintiff failed to prove that the Company breached Section 6.6 of the Operating Agreement.

## B. The Company Did Not Breach Section 6.6 By Failing To Use Commercially Reasonable Efforts To Ensure The Limited Consent Allowed For Tax Distributions.

Plaintiff also contends that the Company breached Section 6.6 of the Operating Agreement by failing to "make commercially reasonable efforts to ensure that any financing documents allow for full Tax Distributions."[218] This contractual obligation is not conditioned on a good faith determination by the Board.

"Delaware courts have interpreted commercially reasonable efforts provisions as 'plac[ing] an affirmative obligation on the parties to take all reasonable steps' to achieve a particular end." *Meyers v. Zimmer Biomet Hldgs., Inc.*, 2026 WL 1194997, at *9 (Del. Ch. May 1, 2026) (alteration in original) (quoting *Williams Cos., Inc. v. Energy Transfer Equity, L.P.*, 159 A.3d 264, 273 (Del. 2017)). Plaintiff argues that

---

[218] OA § 6.6. According to Plaintiff, "[t]h[is] clause exists because the parties understood, when they drafted the [Operating] Agreement against OceanSound's leveraged-buyout capital structure, that the Company would routinely sign new debt instruments, amendments, and consents, and that each carried the risk of choking off the very tax distributions Section 6.6 made mandatory." POB at 45. Notwithstanding Plaintiff's colorful description, the Limited Consent cannot be blamed for the suffocation, asphyxiation, or other violent demise of any Tax Distributions.

the Company breached its commercially reasonable efforts obligation when it negotiated the Limited Consent by failing to raise Tax Distributions with the lender and negotiate language explicitly permitting them.[219]

It is true that the Company did not ask the lender to include language in the Limited Consent expressly permitting Tax Distributions.[220] As Plaintiff himself points out, however, nothing in either the Credit Agreement or the Limited Consent prohibited the Board from making a Tax Distribution. The Limited Consent raised the Consolidated Total Net Leverage Ratio from 3.50x to 3.75x; after the sale of the commercial division, the Company's actual Consolidated Total Net Leverage Ratio was 3.24x, below the 3.75x cap.[221] In Plaintiff's own words, "based on actual EBITDA at the time of closing the [c]ommercial [d]ivision, [the Company] could have paid $19.7 million in tax distributions at closing without violating the 3.75x debt covenant level."[222] In other words, the Limited Consent allowed for a full Tax

---

[219] POB at 45. Plaintiff complains that "when [the Company] negotiated lender flexibility for OceanSound's management fee, it made no parallel request for the mandatory Tax Distribution obligation." PRB at 2. That fact is legally irrelevant. Additional "flexibility" in the Limited Consent was not needed because the Board determined to not pay Tax Distributions irrespective of the Consolidated Total Net Leverage Ratio.

[220] *See* JX 381; Tr. (Benavides) at 154:1–156:24, 231:23–233:6; *id.* (Nordin) at 396:13–18, 478:6–479:4.

[221] JX 455 at 27.

[222] POB at 20; *see also* DAB at 60 ("While the Company disagrees with Plaintiff's argument that it had cash available to make a tax distribution, it does agree that, if the Company had sufficient cash following the sale, nothing in the Limited Consent would have prevented a tax distribution.").

Distribution; the Board still chose to not pay one. As found above, Plaintiff failed to prove that determination was not made in good faith.

Even if the Company had breached Section 6.6 by failing to use commercially reasonable efforts to ensure the Limited Consent allowed for full Tax Distributions, the record does not support a finding that such a breach caused any harm that could be remedied by injunctive or monetary relief. The Board's determinations to not pay Tax Distributions did not turn on the Limited Consent, and nothing in the record suggests the Board would have reached a different determination if the Limited Consent had further increased the Consolidated Total Net Leverage Ratio.

C.    The Company Did Not Breach The Implied Covenant Of Good Faith And Fair Dealing.

As an alternative ground for relief, Plaintiff claims that even if the Company complied with Section 6.6 of the Operating Agreement, it breached the implied covenant of good faith and fair dealing. This argument arises from Plaintiff's buyout theory—he argues that if the parties had "anticipated that the controller would invoke its Section 6.6 reserve discretion not to manage the Company's capital structure but to engineer a coerced acquisition of the Members' equity at progressively lower valuations . . . they would have agreed the discretion could not be deployed for that purpose."[223] As discussed above, the factual premise of this

_____

[223] POB at 44.

argument—that OceanSound used Tax Distributions to coerce a buyout of the Rollover Members' equity—did not bear out at trial.[224] For this reason, the implied covenant claim fails.

### D. Plaintiff's Request For Specific Performance Is Denied.

Plaintiff failed to show that the Company breached Section 6.6 of the Operating Agreement or the implied covenant of good faith and fair dealing. Because Plaintiff did not prove his breach of contract claim, his requests for specific performance and damages are denied.

## III. CONCLUSION

Judgment is entered for Defendant. The parties are directed to meet and confer on a proposed form of order.

---

[224] *See supra* pp. 38–42; POB at 45 ("Because the claim rests on the same record and supports the same remedy, no separate fact-finding is required.").